PATRICK G. BYRNE
Nevada Bar No. 7636
pbyrne@swlaw.com
MICHAEL STEIN
Nevada Bar No. 4760
mstein@swlaw.com
RICHARD C. GORDON
Nevada Bar No. 9036
rgordon@swlaw.com
BRIAN R. REEVE
Nevada Bar No. 10197
breeve@swlaw.com
Snell & Wilmer L.L.P.
3883 Howard Hughes Pkwy., Suite 1100
Las Vegas, Nevada 89169
Telephone:  (702) 784-5200
Facsimile:  (702) 784-5252

*Attorneys for Plaintiff Nobuyuki Sakakibara*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| NOBUYUKI SAKAKIBARA, an individual residing in Japan,<br><br>Plaintiff,<br><br>vs.<br><br>SPECTRUM GAMING GROUP, LLC; SPECTRUM OSA ASIA, LTD.; FREDERIC GUSHIN, an individual; and NFC Global, LLC,<br><br>Defendants. | Case No. |

**COMPLAINT**

Plaintiff NOBUYUKI SAKAKIBARA ("**Sakakibara**") for his claims against Defendants SPECTRUM GAMING GROUP, LLC ("**Spectrum Gaming**"), SPECTRUM OSO ASIA, LTD ("**Spectrum Asia**") (Spectrum Gaming and Spectrum Asia are collectively referred to as the

"**Spectrum Group**"), FREDERIC GUSHIN ("**Gushin**") and NFC GLOBAL, LLC ("**NFC**") alleges as follows:

### PARTIES

1. Plaintiff Sakakibara is an individual and a citizen and resident of Japan.

2. Defendant Spectrum Gaming is a New Jersey limited liability company that is in the business of private investigations.

3. Spectrum Gaming does business in Clark County, Nevada.

4. Defendant Spectrum Asia is in the business of private investigations.

5. Spectrum Asia has offices in Hong Kong, Thailand, Japan, China, Macau, the Philippines and Guam.

6. Spectrum Asia does business in Clark County, Nevada.

7. Defendant Gushin is the Managing Director of Spectrum Gaming and does business in Clark County, Nevada.

8. On information and belief, Defendant Gushin is a resident of the State of New Jersey.

9. On information and belief, Defendant NFC is a Pennsylvania limited liability company that is in the business of conducting private investigations throughout the world.

10. On information and belief, NFC does business in Clark County, Nevada.

### JURSIDICTION AND FACTS IN SUPPORT THEREOF

11. The United States District Court has subject matter jurisdiction over the Fair Credit Reporting Act Violations alleged in the Complaint pursuant to 15 USC § 1681p.

12. This Court has supplemental jurisdiction over Sakakibara's defamation and negligence causes of action pursuant to 28 USC § 1367.

### VENUE

13. Venue is proper in this Court pursuant to 28 USC § 1391(b) because the consumer reports prepared by the Spectrum Group and NFC were issued in Nevada to a Nevada client, the Spectrum Group has an office in Las Vegas, Nevada, and because under 28 USC § 1391(c), the Spectrum Group and NFC reside in the State of Nevada since they are subject to personal

1  jurisdiction in the State of Nevada.

## GENERAL ALLEGATIONS

14. Sakakibara repeats and incorporates all allegations hitherto made as if fully set forth herein.

### History of Pride®

15. PRIDE Fighting Championships ("**PRIDE FC®**" or "**PRIDE®**") was initially planned and devised in 1997 by Sakakibara, who wanted to match a very popular Japanese pro-wrestler named Nobuhiko Takada ("**Takada**") with Brazilian Rickson Gracie ("**Gracie**"), an eighth degree black belt in Brazilian Jiu-Jitsu.

16. The first PRIDE® mixed martial arts ("MMA") event took place at the Tokyo Dome, in Tokyo, Japan on October 11, 1997, with the Takada/Gracie fight as the main event. The event was aptly called PRIDE® 1.

17. In 1999, Dream Stage Entertainment, a Japanese corporation ("DSE-JP"), which was established to provide a more formal organization with corporate status to oversee the organization, promotion and production of PRIDE® events and to operate the expanding PRIDE® business operations not only domestically, but also internationally, including the United States of America.

18. DSE-JP enjoyed great public acceptance and contracted with Tokai Television and Fuji Television to broadcast PRIDE® events on terrestrial television in Japan as a result of increasing public interest in and the popularity of PRIDE® events.

19. PRIDE® events were also broadcast over a pay-per-view satellite network by SKYPerfecTV.

20. DSE-JP continued to oversee the successful organization, promotion and production of PRIDE® brand events, including PRIDE FC® - the main events, PRIDE® *Bushido* and PRIDE® brand tournament events (*Grand Prix, Critical Countdown, Final Conflict, Shockwave and Total Elimination*), in Japan through 2006, with these events being broadcast in over 60 countries including the U.S., South Korea, and Brazil.

21. Through 2006, DSE-JP continued to have success with PRIDE® brand mixed

martial arts events and announced that a PRIDE® event would be held for the first time outside of Japan in the U.S.

22. On October 21, 2006, PRIDE® 32 (*The Real Deal*) was held in Las Vegas, Nevada at the Thomas & Mack Center before an audience of almost 12,000 people.

23. On February 24, 2007, PRIDE® 33 (*The Second Coming*) was held in Las Vegas, Nevada at the Thomas & Mack Center in Las Vegas, Nevada.

### The Purchase and Sale of PRIDE®

24. As a result of the world-class reputation that Sakakibara created with the PRIDE® brand, several people were interested in purchasing PRIDE®, including Frank and Lorenzo Fertitta ("the Fertittas"), who are the majority shareholders of Zuffa, LLC, a Nevada limited liability company ("Zuffa") which owns and operates the Ultimate Fighting Championship ("UFC®").

25. In or about the summer of 2006, the Fertittas expressed to Sakakibara their interest in purchasing PRIDE®.

26. On January 15, 2007, Pride FC Worldwide Holdings, LLC ("Pride FC Worldwide"), formerly known as ANDO Holdings, LLC, an entity formed by the Fertittas for the purpose of purchasing the PRIDE® assets, and DSE-JP entered into a Letter of Intent regarding Pride FC Worldwide's acquisition of the PRIDE® assets (the "**LOI**").

27. The LOI was amended by written amendment to the LOI dated January 18, 2007.

28. The LOI, as amended by the January 18, 2007 amendment, was again amended by a written amendment to the LOI dated February 28, 2007.

29. Pursuant to the LOI, as amended, Pride FC Worldwide and DSE-JP agreed to enter into an Asset Purchase Agreement ("APA") to more fully memorialize the agreement reached for the sale of the PRIDE® assets on the terms and conditions set forth in the LOI, as amended.

30. Under the APA, Pride FC Worldwide had a duty to make reasonable efforts to consult with Sakakibara and to actively seek his advice and recommendations with regard to the PRIDE® business.

31. The parties to the APA agreed that as a condition to any undertaking by Pride FC Worldwide to consult with Sakakibara, Sakakibara would have to submit to and pass any reasonably necessary background checks and drug tests typically conducted by Pride FC Worldwide or its affiliates.

32. On behalf of Pride FC Worldwide, Zuffa retained Spectrum Gaming to conduct the background investigation on Sakakibara on or about April 12, 2007 in connection with his contractual duties to consult with and advise Pride FC Worldwide.

33. On information and belief, Spectrum Gaming retained Spectrum Asia to conduct and/or assist with the background investigation of Sakakibara.

34. In addition to the consulting provision in the APA, Sakakibara entered into a separate Consulting Agreement with Pride FC Worldwide.

35. The term of the Consulting Agreement was from May 24, 2007 through May 24, 2011.

36. Under the terms of the Consulting Agreement, Pride FC Worldwide was required to pay a "Consulting Fee," as defined in the Consulting Agreement.

37. Pride FC Worldwide was required to make one immediate payment and then forty-eight (48) subsequent monthly payments (the "**Monthly Consulting Fee**") for the term of the Consulting Agreement.

38. Pride FC Worldwide ceased making the Monthly Consulting Fee payments based upon the erroneous results of an unprofessional and reckless background check investigation by the Spectrum Group and Gushin regarding Sakakibara alleging that Sakakibara failed to cooperate with his background check and was connected to organized crime in Japan.

39. In addition, a portion of the payment price for the PRIDE® assets, which was supposed to be released to Sakakibara in May 2009, was not released due to the erroneous allegations set forth in the Spectrum Group's reports.

///

///

///

**The Spectrum Group and NFC**

40.     Spectrum Asia is a joint venture of Spectrum Gaming and the San Francisco based OSO Group, Ltd.

41.     Spectrum Gaming and Spectrum Asia have joint offices throughout Asia.

42.     Spectrum Asia holds itself out as being a full-service international gaming consultancy offering a variety of services to casino owners, operators and vendors, as well as gaming commissions.

43.     Spectrum Asia holds itself out as being an independent group of business professionals who utilize a global network of highly skilled associates drawn from all fields to deliver business information to multinational corporations, law firms, financial houses, regulatory agencies and other entities with varying business needs.

44.     Spectrum Asia touts itself as being an expert in, among other things, due diligence inquiries, employee vetting, fraud inquiries and litigation and investigative support and boasts that it undertook more than 300 due diligence investigations of companies and individuals across Asia.

45.     Spectrum Asia further touts itself as a *specialist provider* of business intelligence and a dedicated casino gaming consultancy services through a strategic partnership with Spectrum Gaming.

46.     Spectrum Asia works through its associations with Spectrum Gaming to represent clients in Nevada, New Jersey, San Francisco, New York, Washington and Dublin, Ireland and many other locations around the globe.

47.     Spectrum Gaming holds itself as being the world's foremost gaming research and professional services firm which utilizes its staff and global network of affiliates and associates to employ renowned experts in every facet of the gaming industry, from research to regulation.

48.     Spectrum Gaming holds itself out as assisting its clients in developing and maintaining the highest standards of integrity required in the development, operation and regulation of the various gaming business as their major priority and in doing so its services include, but are not limited to suitability inquires, vendor vetting, personnel recruitment and

litigation support.

49. Spectrum Gaming touts itself, and its partners, as having been retained by operators, developers and investors in five continents and serves, and has served, clients through its offices in Atlantic City, Bangkok, Guangzhou, Harrisburg, Hong Kong, Las Vegas, Macau, Manila and Tokyo.

50. Spectrum Gaming touts itself, and its partners, as being proficient in the performance of detailed background checks and investigations to provide both regulators and operators with the information they need to make critical decisions concerning approvals and associations.

51. Spectrum Gaming touts itself, and its partners, as providing the following due diligence services: Corporate entity investigations, Vendor licensing investigations, Employee licensing investigations, Country evaluations, Business intelligence, Operational review and financial forecast of acquisition targets.

52. Spectrum Asia and Spectrum Gaming hold themselves out to the public as partners.

53. NFC conducts investigations for gaming clients both nationally and internationally.

54. NFC's investigations have included gaming license investigations, due diligence on vendors and potential partners, internal investigations, audits, surveillance, electronic sweeps, executive screening and litigation support.

55. NFC holds itself out as having a "strategic alliance" with Spectrum Gaming that provides NFC with legal gaming expertise and helps to formulate a "one stop shop" for all gaming regulatory, compliance and investigative needs for its clients.

## COUNT ONE

### Violation of the Fair Credit Reporting Act

### (Against All Defendants)

56. Sakakibara repeats and incorporates all allegations hitherto made as if fully set forth herein.

57.   This is a claim for violations of 15 U.S.C. § 1681 et. seq. – the Fair Credit Report Act ("**FCRA**").

58.   The Spectrum Group and NFC are engaged in the business of private investigations and were therefore acting in the capacity of private investigator firms when they investigated and conducted background checks on Sakakibara.

59.   The Spectrum Group and NFC are consumer reporting agencies as defined by 15 U.S.C. § 1681a(f).

60.   Gushin is a consumer reporting agency as defined by 15 U.S.C. § 1681a(f).

61.   Sakakibara is a consumer as defined by the FCRA.

62.   On behalf of Pride FC Worldwide, Zuffa retained the services of the Spectrum Group to conduct a due diligence background investigation on Sakakibara and other DSE-JP employees who were going to be employed by legal entities affiliated with Pride FC Worldwide after the sale of the PRIDE® assets was complete.

63.   On information and belief, based on a letter dated November 15, 2007 from the Pride FC Worldwide's legal counsel, the Spectrum Group issued a "Final Report" on or about October 8, 2007 concluding that Sakakibara "would never be able to satisfy applicable standards governing moral turpitude, ethical fitness and criminal affiliation[.]"

64.   The Spectrum Group's Final Report constitutes a consumer report, as defined by 15 U.S.C. § 1681a(d), or an investigative consumer report, as defined by 15 U.S.C. § 1681a(e).

65.   On information and belief, the Spectrum Group, with NFC's assistance, provided the Pride FC Worldwide with other confidential reports, letters and/or communications regarding Sakakibara's background check, which also constitute consumer reports as defined in the FCRA.

66.   The Spectrum Group and NFC failed to use reasonable procedures to assure maximum possible accuracy and to conduct the investigation of Sakakibara in a professional manner by, but not limited to, failing to use trained translators to translate Sakakibara's Personal History Disclosure, Net Worth Statement and Corporate History Disclosure forms; failing to use trained interpreters to interpret interviews of Sakakibara; failing to provide the Personal History Disclosure, Net Worth Statement, and Corporate History Disclosure directly to Sakakibara;

failing to provide any instructions concerning the Personal History Disclosure, Net Worth Statement and Corporate History Disclosure, which the Spectrum Group neither explained orally nor provided written documents about; failing to allocate adequate resources to accomplish the background check; failing to provide written requests to Sakakibara for additional documents that the Spectrum Group deemed necessary and willfully, or at a minimum, negligently failing to conduct the background checks in a reasonable manner typically conducted by Pride FC Worldwide and its affiliates.

67. The consumer reports prepared and published by the Spectrum Group and NFC for Pride FC Worldwide are inaccurate, within the meaning of FCRA, because these reports are patently incorrect and misleading in such a way and to such an extent that it can be expected to have an adverse effect on Sakakibara and, in fact, did have an adverse effect on Sakakibara.

68. Based on the Spectrum Group's reports, Pride FC Worldwide believed that Sakakibara did not cooperate with the background investigation; worked with vendors that have had affiliations with groups in Japan that disqualify Sakakibara from serving as a consultant; should be deemed a person of "unsuitable" character and that he was of bad moral turpitude, lacking ethical fitness and had criminal affiliation.

69. The Spectrum Group and NFC violated the FCRA by:
    a. Furnishing a consumer report for impermissible purposes;
    b. Failing to follow reasonable procedures to assure maximum possible accuracy;
    c. Failing to conduct mandatory reinvestigation; and
    d. Failing to correct inaccurate or incomplete information.

70. The Spectrum Group and NFC knowingly and willfully failed to comply with the requirements of the FCRA.

71. The Spectrum Group knowingly and willfully furnished a consumer report or an investigative consumer report regarding Sakakibara to Pride FC Worldwide without complying with the requirements of the FCRA because its was repeatedly advised that the information it was reporting was incomplete and inaccurate and ignored requests from Sakakibara's legal counsel in

1  Japan to correct the information instead asserting that it was "too late" to correct any inaccuracies of information that it intended to publish or did publish in its reports without providing any scope of reinvestigation.

72. The Spectrum Group and NFC negligently failed to comply with the requirements of the FCRA.

73. The Spectrum Group failed to adopt, implement, maintain or follow procedures to assure maximum possible accuracy of the information in its reports and therefore failed to comply with the FCRA.

74. The reports were knowingly drafted based on incomplete, unverified and inaccurate information.

75. The Spectrum Group violated 15 USC 1681d(d)(1) by preparing and furnishing its reports without first receiving the certificate required by 15 USC § 1681d(a)(2).

76. The Spectrum Group conducted interviews of persons concerning Sakakibara without complying with 15 USC § 1681d(d)(4).

77. The aforementioned violations of the FCRA were done willfully and/or negligently.

78. As a result of the inaccurate information contained in the Spectrum Group's reports and the willful actions by the Spectrum Group constituting violations of the FCRA, Sakakibara has suffered damage to his reputation, worry, fear, distress, frustration, embarrassment, humiliation and loss of monies due and owing, and due to be paid, from the Pride FC Worldwide Entities in an amount in excess of $5,000,000.00 US.

## COUNT TWO

### Defamation and Defamation Per Se

### (Against All Defendants)

79. Sakakibara repeats and incorporates all allegations hitherto made as if fully set forth herein.

80. The information and statements contained in the Spectrum Group and NFC's reports are not privileged.

-10-

81. The Spectrum Group, NFC and Gushin knew, or should have known, that the information and statements contained in its reports and published to the Pride FC Worldwide Entities concerning the investigation and background check of Sakakibara was incomplete, inaccurate and false.

82. The Spectrum Group, NFC and Gushin willfully and intentionally included information in its reports that was incomplete, inaccurate and false.

83. The inaccurate information and statements contained in the Spectrum Group's reports tend to lower Sakakibara's reputation in the estimation of the business community, mixed martial arts community, entertainment community, and broadcasting business community and society at large, and to excite derogatory opinions against him and to hold him up to contempt.

84. The Spectrum Group, NFC and Gushin's reports were defamatory per se because the information and statements contained therein imputed Sakakibara's lack of fitness for trade, business or profession and imputation of criminal activity and affiliation.

85. The statements contained in the reports defamed Sakakibara.

86. The Spectrum Group, NFC and Gushin's actions were malicious and/or oppressive such that Sakakibara is entitled to punitive damages.

87. Sakakibara has suffered emotional damage due to the reports.

88. Sakakibara has suffered damage to his reputation as a result of the information and statements contained in the reports.

89. Sakakibara has suffered damages in an amount in excess of $5,000,000.00 as a result of the information and statements contained in the Spectrum Group's reports.

<u>**COUNT THREE**</u>

**Negligence**

**(Against All Defendants)**

90. Sakakibara repeats and incorporates all allegations hitherto made as if fully set forth herein.

///

91. The Spectrum Group, NFC and Gushin had a duty to Sakakibara to perform the investigation and background checks of Sakakibara in a professional manner.

92. The Spectrum Group, NFC and Gushin had a duty to Sakakibara to adopt or implement procedures to assure maximum possible accuracy of the information and statements in their reports.

93. The Spectrum Group, NFC and Gushin knew, or should have known, that the information and statements contained in their reports concerning the investigation and background check of Sakakibara were incomplete, inaccurate and false.

94. The Spectrum Group, NFC and Gushin willfully included information and statements in the reports that were incomplete, inaccurate and false.

95. The Spectrum Group, NFC and Gushin failed to adopt, implement, maintain or follow reasonable procedures to assure maximum possible accuracy of the information in their reports.

96. As a result of the false and inaccurate information contained in the Spectrum Group's reports, Sakakibara has suffered damage to his reputation, worry, fear, distress, frustration, embarrassment, humiliation and loss of monies due and owing, and due to be paid, from the Pride FC Worldwide Entities in an amount in excess of $5,000,000.00.

## PRAYER FOR RELIEF

**WHEREFORE**, Sakakibara prays for relief as to each and every claim for relief in his Complaint as follows:

1. As to Count One:
    A. For actual damages in an amount in excess of $5,000,000.00 pursuant to the FCRA against Spectrum Asia, Spectrum Gaming, NFC and Gushin in favor of Sakakibara; and
    B. For punitive damages under the FCRA.
2. As to Count Two:
    A. For actual, compensatory, consequential and punitive damages in an amount in excess of $5,000,000.00 against Defendants Spectrum

      Asia, Spectrum Gaming, NFC and Gushin and in favor of Sakakibara.

3. As to Count Three:

  A. For actual, compensatory, and consequential damages in an amount in excess of $5,000,000.00 against Defendants Spectrum Asia, Spectrum Gaming, NFC and Gushin and in favor of Sakakibara.

4. As to each Count:

  A. That Sakakibara be awarded his costs of suit and reasonable attorneys' fees; and

  B. That the court enters such additional relief as it may find just and proper.

Respectfully submitted this 14th day of October 2009.

      SNELL & WILMER L.L.P.

      /s/ Michael Stein
      PATRICK G. BYRNE
      MICHAEL STEIN
      RICHARD C. GORDON
      BRIAN R. REEVE
      3883 Howard Hughes Parkway, Suite 1100
      Las Vegas, Nevada 89169
      ***Attorneys for Plaintiff Nobuyuki Sakakibara***

10627656